# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA CHARLOTTE DIVISION

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) )  ) |
| Plaintiff, | ) ) |
| | ) |
| vs. | )  Civil Action |
| TRUDY R. GILMOND, | )  No. |
| | ) |
| Defendant, | ) |
| | ) |

_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC")

alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action concerns Defendant Trudy R. Gilmond's role in

perpetrating the fraudulent unregistered offer and sale of securities (in the form of

unregistered investment contracts) through Rex Venture Group, LLC ("RVG")

d/b/a www.ZeekRewards.com ("ZeekRewards"), an internet-based combined

Ponzi and pyramid scheme.

2. RVG and its principals, employees, and promoters solicited investors through the internet and over interstate wires to participate in the ZeekRewards program, a self-described "affiliate advertising division" for the companion website, www.zeekler.com ("Zeekler"), through which RVG operated penny auctions.

3. From approximately January 2011 until RVG and ZeekRewards were shut down in August 2012, RVG raised more than $850 million from approximately 1 million investors nationwide and overseas by making unregistered offers and sales of securities through the ZeekRewards website in the form of Premium Subscriptions and VIP Bids.

4. Gilmond was one of the most successful and prolific promoters of ZeekRewards. From at least September 2011 until ZeekRewards was shut down in August 2012, Gilmond worked closely with the company founders and served as a senior "field liaison" to promote the scheme, persuading scores of unsophisticated retail investors to buy ZeekRewards securities upon the promise of profit sharing. Gilmond reaped more than $1.7 million in transaction-based commissions and bogus profit-sharing for her recruiting efforts.

5. Unbeknownst to its investors, ZeekRewards was, in reality, a massive Ponzi and pyramid scheme. Approximately 98% of ZeekRewards' total revenues,

and correspondingly the share of purported "net profits" paid to investors, were comprised of funds received from new investors rather than legitimate retail sales.

6.      In her role supporting ZeekRewards, Gilmond has violated, and unless enjoined will continue to violate, the registration, broker-dealer registration, and anti-fraud provisions of the federal securities laws.  Unless restrained and enjoined, Gilmond is likely to engage in future violations of the federal securities laws. Accordingly, the Commission seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against her.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(l) & 77v(a)] and  Sections 21(d)(l), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa].  Gilmond has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

8.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this District.

Gilmond transacted business, and participated in the offer and sale of the securities that are the subject of this action, including to investors in this District.

## DEFENDANT

9.    **Trudy R. Gilmond**, age 45, is a resident of Vermont, but at all relevant times she worked as a field liaison for the ZeekRewards scheme and operated Team Fired Up to solicit new investors throughout the United States (including in this District) for ZeekRewards, an internet website ([www.zeekrewards.com](http://www.zeekrewards.com)) with physical operations in Lexington, North Carolina.

## FACTUAL ALLEGATIONS

### ORIGINS OF ZEEKREWARDS

10.    In 2010, Paul Burks and others created Zeekler.com, a penny auction website offering items ranging from personal electronics to cash. Penny auctions required participants to pay a non-refundable fee (typically $.50 to $1.00) to purchase and place each incremental "bid" (typically one cent) on merchandise sold via auction. The penny auctions were not particularly successful until Burks, through his company, RVG, and with assistance from Dawn Wright-Olivares and others, launched ZeekRewards in January 2011.

11.    ZeekRewards was the self-described "private, invitation-only, affiliate advertising division" of Zeekler. Burks, Wright-Olivares, and others operated ZeekRewards as a multi-level marketing ("MLM") program, offering subscription

memberships to affiliates who then recruited new affiliates and bought and gave away as samples, or sold, packages of bids (*e.g.*, a package of 10,000 bids) for the penny auction website. In fact, the vast majority of bids used in the penny auctions were acquired by ZeekRewards affiliates to give away as "free" samples.

12. Rather than promoting penny auctions, Burks, Wright-Olivares, and others primarily marketed ZeekRewards to investors as an opportunity to earn passive income indefinitely through their participation and recruiting. Gilmond was an early investor in the scheme and became one of ZeekRewards most successful promoters, marketing ZeekRewards to investors and working closely with Wright-Olivares and other ZeekRewards insiders.

### THE ZEEKREWARDS OFFERING

13. RVG personnel solicited persons to become investors or "affiliates" in ZeekRewards through publicly accessible websites (including www.zeekrewards.com) that RVG and Burks owned, operated, controlled, or sponsored.

14. Through the ZeekRewards program, RVG offered affiliates several ways to earn money, two of which involve the offer and sale of securities in the form of investment contracts: the "Retail Profit Pool" and the "Matrix."

15. Gilmond is a self-described network marketer who has participated in numerous MLM programs, operating under the trade name "Team Fired Up" to

attract followers and new recruits to join her "downline" in those MLM programs (several of which ultimately collapsed in a fashion similar to ZeekRewards). By January 2011, Gilmond, who was recruited by Wright-Olivares, joined ZeekRewards as an affiliate and began promoting it to others.

16.     Gilmond operated a full-time business soliciting new affiliates and helping her "downline" recruits to solicit even more investors as "customers." She purchased customer leads, posted advertisements, and distributed business cards to identify new investors-customers. She also spoke at company events and hosted live promotional and training conference calls with Wright-Olivares and other ZeekRewards insiders to pitch the ZeekRewards scheme to prospective investors and to guide new affiliates in their own recruiting efforts. She helped enroll investors as "affiliates," entitling them to share in the scheme's purported profits.

17.     Neither Gilmond nor any RVG personnel made any effort to determine if investors in fact had: (1) the financial wherewithal to invest (*e.g.*, sufficient income and assets); or (2) experience with complex investments before offering them the opportunity to invest in ZeekRewards. In fact, thousands of ZeekRewards investors lacked significant financial resources and were financially unsophisticated.

18.     From at least January 2011 until August 2012, when RVG and ZeekRewards were shut down, RVG raised at least $850 million through the offer

and sale of securities (via the Retail Profit Pool and the Matrix) to approximately 1 million domestic and international investors.

19.    No registration statement was ever filed or was ever in effect with the Commission with respect to the ZeekRewards securities offered and sold by Gilmond, the RVG insiders and others.

### 1. THE RETAIL PROFIT POOL

20.    Gilmond and other RVG personnel attracted new investors to ZeekRewards with the promise of daily profit-share awards distributed through the Retail Profit Pool, which operated as a Ponzi scheme. Gilmond directed her new recruits to the ZeekRewards website (through a link identifying Gilmond as the point of contact) to learn about the offering. According to the website, through the Retail Profit Pool the company shared "up to 50% of the daily net profits" with affiliates who meet certain qualifications ("Qualified Affiliates").

21.    To become a Qualified Affiliate, investors were required to satisfy four criteria: (i) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; (ii) enroll new penny auction customers personally, through the ZeekRewards co-op program, or through third-party businesses endorsed by ZeekRewards; (iii) sell at retail or purchase and give away as samples a minimum of ten Zeekler.com bids, earning Profit Points; and (iv) place one free ad daily for Zeekler.com and submit proof to ZeekRewards.

22.     The requirements to become a Qualified Affiliate constitute an investment in a common enterprise and required little or no effort by individual investors.

23.     Qualified Affiliates had no role in ZeekRewards' operations. RVG and its personnel alone created, updated and operated the websites, handled all payments, managed the bank accounts and payment service providers, managed affiliate and customer accounts, managed all affiliate and customer services, oversaw and disbursed all bids, operated the auctions, created all advertisements, sponsored recruiting videos and calls, managed the Matrix, and decided the daily payout percentages for the Retail Profit Pool.

24.     Investor funds were pooled and commingled in a handful of financial institutions, and were also commingled with ZeekRewards and the penny auction website's overall revenues from all company operations.

25.     Qualified Affiliates earned Profit Points by either (a) selling penny auction bid packages directly to retail customers ("Retail Bids"), or (b) purchasing "VIP Bids" and giving them away as samples to retail customers or to other personally-sponsored affiliates.

26.     Most Qualified Affiliates opted to simply purchase VIP Bids (up to a maximum $10,000 investment) and give them away as samples in order to earn Profit Points. Even then, affiliates did not need to exert any effort in giving away

the VIP Bids they purchased, because RVG created automated programs, including the "Customer Co-Op" and the "5CC," that generated purported customers to whom the bids could be given automatically without any further effort by affiliates.

27.     In order to earn daily dividends, affiliates also were required to place one free internet advertisement daily for the company, but that exercise required little or no effort.  Affiliates could merely copy and paste free ads – created by RVG personnel without input from affiliates – from a company-sponsored program, which the ZeekRewards website boasted should take no more than five minutes per day.  Affiliates also could employ a third-party program to generate ads automatically for them; affiliates simply had to verify that they had placed the ad by submitting an internet link to ZeekRewards.  Placing more or better ads did not increase a Qualified Affiliate's share of profits.

28.     Qualified Affiliates were paid their share of supposed net "profits" from the Retail Profit Pool in the form of daily "awards" or dividends on accumulated Profit Points.

29.     The size of the each Qualified Affiliate's daily award was dependent solely on how many Profit Points that investor had accumulated; it was not based on rendering any significant service to ZeekRewards.  Thus, buying and giving away more VIP Bids garnered greater Profit Points, hence a larger daily profit share award, without any additional effort required.

30.     Qualified Affiliates had the option to receive their daily "award" (typically approximately 1.5% per day) as: (i) a cash payment; (ii) additional Profit Points; or (iii) a combination of both.

31.     The daily award had a compounding effect for those Qualified Affiliates who elected to receive the daily award as new Profit Points rather than cash.

32.     As a result of the compounding effect, by the time ZeekRewards was shut down in August 2012, Qualified Affiliates had nearly 3 billion Profit Points outstanding. Based on an average daily award of 1.5%, the company would have been obligated to pay out approximately $45 million per day if all Qualified Affiliates elected to receive their daily award in cash. Such payouts would have depleted the company's cash reserves in a matter of days.

### 2. THE MATRIX

33.     ZeekRewards also employed "Matrix" that acted like a pyramid scheme by rewarding investors for recruiting others to join the scheme. The company placed each newly recruited affiliate into a "2x5 forced-fill matrix," which was a multi-level marketing pyramid with 63 positions that pooled new investors' money and paid a bonus to affiliates for every "downline" investor within each affiliate's personal matrix.

34.     Affiliates that had (i) enrolled in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (ii) recruited at least two other "Preferred Customers" (i.e., investors who have likewise enrolled in a monthly subscription plan) qualified to earn bonuses through the Matrix.

35.     Once qualified, an affiliate received bonuses and commissions for every paid subscription within her downline 2x5 pyramid, whether or not she personally recruited everyone within the matrix. Furthermore, affiliates were rewarded merely for recruiting new investors without regard to any efforts by the affiliates to sell bids or otherwise support the retail businesses (including the Zeekler penny auctions).

36.     Investors' Matrix bonuses and the company's (and the company's promoters') profits were derived from the same source: the overall revenues generated from new investors to the ZeekRewards program (approximately 98% of the total) and, to a much lesser extent, from the penny auction website (approximately 2% of the total).

### RVG's Operation of a Fraudulent Ponzi and Pyramid Scheme

37.     Burks and others designed the ZeekRewards program as a fraudulent scheme.

38.     Burks and other RVG personnel chose an average 1.5% daily dividend to Qualified Affiliates to sustain the false impression that the business

earned approximately 125% returns every 90 days; in fact, the company's retail profits from penny auctions were miniscule and the daily awards could only be supported by funds received from ever increasing investments by legions of new affiliate investors.

39. The promised daily dividends and profit sharing bore no relation to the company's actual net profits. Instead, Burks unilaterally and arbitrarily determined the daily dividend rate so that it fluctuated slightly each day but averaged approximately 1.5% per day, giving investors the false impression that the business was highly profitable.

40. Burks and other RVG personnel failed to disclose that, without new investor deposits in the form of VIP Bid purchases and subscription fees, revenues would be substantially reduced, as only approximately 2% of daily revenues came from actual retail sales. Without a constant infusion of capital from new investors, the scheme would likely collapse.

41. Based on the average 1.5% daily dividend on 3 billion Profit Points outstanding when ZeekRewards was shut down in August 2012, ZeekRewards would have owed nearly $45 million per day in profit share awards to investors (Qualified Affiliates) if all such investors requested cash rewards instead of points. The company's actual daily revenues -- which averaged approximately $5 million per day (based almost entirely on new affiliate subscriptions and VIP bid

purchases) at the time ZeekRewards was shut down – could not support such daily cash payouts.

**GILMOND'S ROLE IN THE FRAUDULENT SCHEME**

42. As a combined Ponzi and pyramid scheme, ZeekRewards depended on promoters like Gilmond to persuade new investors to join as affiliates to maintain a constant influx of new capital to be paid to prior investors.

43. Gilmond directed members of her "Team Fired Up" and other prospective investors to the ZeekRewards website, which made false representations about daily net profits and daily dividends paid to Qualified Affiliates. Based on Gilmond's efforts and the misstatements on the website, many of Gilmond's team members ultimately purchased the ZeekRewards securities, earning Gilmond substantial commissions.

44. As a field liaison, Gilmond had access to portions of ZeekRewards' internal electronic investor database so that she could make adjustments to individual accounts to address her affiliates' concerns or complaints. Among other things, Gilmond had the ability to adjust the number of "points" earned and could assign downline recruits to certain affiliates, both of which impacted the measure of profit sharing or commissions paid to those affiliates. In addition, Gilmond developed close ties with Wright-Olivares and other ZeekRewards insiders, which gave her unique access and insight not available to a typical investor.

13

45. Having worked closely with the company founders and insiders to promote the scheme in her role as a senior field liaison, and given her prior experience with similar MLM programs that ultimately collapsed, Gilmond knew or should have known that the ZeekRewards scheme's outsize returns (averaging 1.5% per day) were too good to be true and could not be sustained.

46. Nevertheless, Gilmond worked full time for at least a year touting the potential fortunes that could be made by becoming a ZeekRewards affiliate. Gilmond's sales pitch involved explaining the mechanics of the ZeekRewards program, its compensation structure, and the supposed merits of the investment.

47. New investors typically signed up for ZeekRewards through Gilmond's website; Gilmond also worked with Wright-Olivares to ensure that Gilmond received credit (and, ultimately, commissions) for affiliate investors that she recruited but who failed to identify Gilmond as their sponsor.

48. Gilmond often helped investors she recruited to sign up and arrange payments (using credit cards, online payment systems, or checks payable to Gilmond for the investors' bid purchases); she also frequently helped them navigate problems with their personal electronic accounts to ensure daily dividends were credited to their accounts.

49. Furthermore, Gilmond also helped conceal from investors and regulators the true nature of the ZeekRewards scheme. To that end, Wright-

Olivares and others directed, and Gilmond helped implement, several superficial or nominal changes to certain ZeekRewards features. This included removing any references on the website to the terms "investment" and "ROI"; substituting a daily award percentage that in the aggregate approximated 125% every 90 days rather than "guaranteeing" a 125% return; and requiring investors to give away VIP bids to foster the illusion of contributing efforts to the enterprise.

50. Gilmond helped police affiliate advertisements and communications to ensure they did not describe ZeekRewards as a passive "investment" or refer to any "guarantees," "ROI," or similar investment-related terms. Gilmond also reported to ZeekRewards insiders (typically Wright-Olivares) whenever affiliates improperly employed such taboo terminology.

51. In May 2012, Gilmond signed a consulting agreement with ZeekRewards to confirm her role with the company.

52. As a result of Gilmond's efforts, she received $461,964 in Matrix commissions based on investments made by her downline recruits. Gilmond also received an additional $1,300,074 in daily dividend payments and bonuses based on bid purchases and compounding of payments in the Retail Profit Pool as a result of her promoting and facilitating the distribution of ZeekRewards securities.

## ZEEKREWARDS' DEMISE

53. Despite encouraging affiliates to purchase and give away VIP Bids to promote and drive traffic to the Zeekler penny auction website, RVG failed to disclose that few of the VIP Bids given away by Qualified Affiliate investors were actually used on the penny auction website. Of approximately 10 billion VIP Bids purchased by or awarded to investors, less than one-quarter of one percent were actually used in auctions on the Zeekler penny auction website.

54. Although ZeekRewards paid out hundreds of millions of dollars to Qualified Affiliates through the Retail Profit Pool and the Matrix, by July 2012 the company had insufficient deposits to satisfy future awards based on outstanding Profit Points and Matrix commissions and bonuses. Thus, the scheme was nearing collapse at the time it was shut down in August 2012.

55. Aware that ZeekRewards was under investigation by several law enforcement agencies and that the business was in serious trouble in 2012, Gilmond and others withdrew substantial sums of money from the scheme before it was shut down, without advising investors that the scheme was likely to collapse.

## FIRST CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

56.     The Commission realleges and incorporates by reference the foregoing paragraphs.

57.     By engaging in the conduct described above, Gilmond directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

58.     No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings or sales alleged herein.

59.     By engaging in the conduct described above, Gilmond violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### FAILURE TO REGISTER AS A BROKER-DEALER

### Violation of Section 15(a) of the Exchange Act

60.     The Commission realleges and incorporates by reference the foregoing paragraphs.

61. By engaging in the conduct described above, Gilmond directly or indirectly made use of the mails or means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being registered as a broker or dealer or associated with an entity registered as a broker or dealer in accordance with Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

62. Gilmond was not registered as a broker or dealer, or associated with an entity registered as a broker or dealer, during the course of any of the securities offerings or sales alleged herein.

63. By engaging in the conduct described above, Gilmond violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## THIRD CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violation of Section 17(a) of the Securities Act

64. The Commission realleges and incorporates by reference the foregoing paragraphs.

65. By engaging in the conduct described above in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Gilmond

obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

66.    Gilmond acted at least negligently in engaging in the conduct described above, including the preceding paragraph.

67.    By engaging in the conduct described above, Gilmond violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Securities and Exchange Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Gilmond committed the alleged violations described hereinabove.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Gilmond and her agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them,

who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o].

## III.

Order Gilmond to disgorge all ill-gotten gains, with prejudgment interest, resulting from the illegal acts or courses of conduct alleged in this Complaint.

## IV.

Order Gilmond to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: December 4, 2015   Respectfully submitted,

        */s/ John J. Bowers*
        John J. Bowers (NC Bar No. 23950)
        Stephen L. Cohen
        J. Lee Buck, II
        Brian M. Privor
        Alfred C. Tierney
        U.S. Securities and Exchange Commission
        100 F Street, N.E.
        Washington, DC 20549-5971
        Telephone: (202) 551-4645 (Bowers)
        Facsimile: (703) 813-9359
        *Email: BowersJ@sec.gov*

        Attorney for Plaintiff
        Securities and Exchange Commission